## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-00171-COA

**KUNTA KIDD A/K/A KUNTA KENTA KIDD**         **APPELLANT**
**A/K/A JACOB KIDD**

**v.**

**STATE OF MISSISSIPPI**         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/20/2017 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: ERIN ELIZABETH BRIGGS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | PATRICIA A. THOMAS BURCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/23/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLTON, P.J., GREENLEE AND McCARTY, JJ.**

**GREENLEE, J., FOR THE COURT**:

¶1. In 2017, a Forrest County grand jury indicted Kunta Kidd for kidnapping, armed robbery, and aggravated assault. The State proceeded to trial on the kidnapping and aggravated-assault charges, and Kidd was found guilty of both. On appeal, Kidd claims (1) the evidence was insufficient to support his convictions, (2) the jury's verdicts are against the overwhelming weight of the evidence, (3) he was denied his right to confrontation and his right to compulsory process, (4) the prosecutor engaged in prosecutorial misconduct, and (5) he received ineffective assistance of counsel. Finding no reversible error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     At trial, sixty-three-year-old Eugene Buckley testified that when he arrived at his house in Hattiesburg, Mississippi, on September 17, 2016, he noticed Kunta Kidd drinking beer in his yard. Although it was getting dark outside, Buckley told Kidd that it was too early for any nonsense. As Buckley opened his door, another man knocked him down and started beating him and searching his clothing, including his socks and shoes. Then Kidd joined in. According to Buckley, the men took his money and then left.

¶3.     When questioned further about the incident, Buckley testified that as the men were beating him, he lied and told them that his friend, Robert Boles, had his money. Buckley hoped that the men would take him to Boles's house and that Boles would call the police. But when they arrived, Kidd stayed in the vehicle with Buckley while the other man knocked on Boles's door. When Boles did not answer, the man returned to the vehicle, and Kidd went and knocked on the door. Buckley testified that he overheard Kidd ask Boles for his (Buckley's) money, but Boles said he did not have it. According to Buckley, someone was in the vehicle with him at all times, and he was not able to leave. He also testified that Kidd had a gun, and the other man acted like he had a gun.

¶4.     Buckley testified that the men took him back to his house and continued to beat him. According to Buckley, he eventually took off his shoe and sock and gave them $1,000. And at that point, the men left. Defense counsel asked why the men did not find the money when they were searching him earlier, and Buckley testified that they did not pull his shoes off.

¶5.     When asked about the burns on his body, Buckley testified that he forgot about that

2

part. According to Buckley, before the men left, they threw gasoline on him, and Kidd used a cigarette lighter to set him on fire.

¶6. Buckley testified that his nephew, David Alexander (a.k.a. "Man"),[1] checked on him every day. And Alexander showed up at some point during the incident. According to Buckley, Kidd told Alexander that Buckley owed him some money, so Alexander left.[2] But Buckley testified that Alexander returned while he was on fire and threw a sheet over him to extinguish the flames. Then Alexander took Buckley to Forrest General Hospital, but Alexander did not stay with him.

¶7. Buckley was at the hospital briefly before he was airlifted to the burn center in Jackson. According to Buckley, he initially told the police that he did not want to talk about the incident because he feared for his life. But once he was assigned a room, he identified Kidd as one of the suspects. At trial, the prosecutor asked Buckley if he saw Kidd in the courtroom, and Buckley said, "No. . . ." Buckley was then instructed to stand up and look around the courtroom. Buckley said, "Really, I don't believe the person was from Hattiesburg." The prosecutor clarified that he was asking about Kidd and not the unidentified suspect. Then Buckley identified Kidd as the person who set him on fire.

¶8. Boles testified that he heard Buckley's truck outside his house around midnight. Boles and Buckley had talked earlier, and Buckley indicated that he might stop by. But when

---

[1] Buckley also referred to Alexander as his cousin.

[2] It is not clear from the record, but Alexander may have said to Kidd, "I understand, man. . . . [D]o what you've got to do."

3

Boles answered the door, he was surprised to see Kidd and not Buckley.[3]  Although Boles sometimes held money for Buckley, he was not on that date.  Boles testified that he told Kidd that he did not have Buckley's money, and then Kidd drove away.  According to Boles, there were two other people inside the vehicle, but it was too dark to identify them.  Boles testified Buckley's cousin—Fonda Williams—called him a few hours later to tell him that Buckley was in the hospital.

¶9.     Fonda Williams testified that around 1 a.m., her son—David Alexander—called her and told her to go to the hospital.  According to Williams, when she arrived at the hospital, Buckley identified Kidd as a suspect.  But on cross-examination, Williams testified that she was not sure if Buckley identified Kidd as a suspect at the hospital or at the burn center.

¶10.    Another one of Buckley's cousins, Janet Creekmoore, testified that Williams told her to go to the hospital.  According to Creekmoore, Buckley told her that Kidd burned him because he would not give him his money.

¶11.    Officer Thomas Robinson Sr., with the Hattiesburg Police Department, responded to the hospital.  He testified that Buckley's hospital room smelled of gasoline, and he noticed that Buckley had been burned.  According to Officer Robinson, Buckley stated that two African-American males robbed him, and then his nephew drove him to the hospital.  But Buckley refused to tell Officer Robinson who the suspects were because he was scared that they would "come back and finish him off."

¶12.    When Officer Robinson stepped outside the hospital room, he spoke with Williams,

_____

[3] Boles testified that he recognized Kidd from seeing him around the community.

4

who stated that Alexander called her and told her that Buckley had been burned. She stated that she then called Boles, who identified Kidd as a suspect. But at the time, Buckley would not identify the suspects. Officer Robinson testified that he tried to get in touch with Alexander, but he did not have Alexander's contact information.[4] According to Officer Robinson, Buckley did not identify Kidd as a suspect until after he turned the case over to the detectives.

¶13.    Jeff Byrd, the crime scene investigator, testified that he found a burned shirt inside of Buckley's house. He also found a small reddish stain, which he believed was blood and another unknown substance that was possibly flesh. When asked why nothing was submitted to the Mississippi Forensics Laboratory for testing, Byrd explained that he was not responsible for making that decision.

¶14.    Lieutenant Dale Bounds testified that he obtained written statements from Williams and Creekmore on September 19. They stated that Buckley told them at the burn center that Kidd robbed him and set him on fire. Lieutenant Bounds then called Buckley at the burn center, and Buckley confirmed that Kidd had stolen $1,000 from him and set him on fire.

¶15.    Once Buckley was released from the burn center, Lieutenant Bounds spoke with him in more detail. Buckley stated that on September 17, 2016, Kidd had been hanging out at his house all day, drinking and asking for drugs. And eventually, Kidd started demanding money. Buckley told him that two people were involved in the incident—Kidd and a tall, slender African-American male with plats in his hair. Lieutenant Bounds spoke with Boles,

---

[4] Officer Robinson testified that he asked Williams for Alexander's phone number, but Williams told him that Alexander called her from a blocked number.

5

who stated that Kidd came to his house asking for Buckley's money that night. And Lieutenant Bounds spoke with Alexander over the telephone, but Alexander stated that he did not have any information.

¶16. After the State rested its case-in-chief, Kidd testified in his defense. Kidd testified that around 10:30 p.m. or 11 p.m. on September 17, 2016, he and his cousin, Amber, stopped by Buckley's house on their way to the store. Kidd testified that he had known Buckley for years, and Buckley owed him a payment for cocaine. According to Kidd, Buckley answered the door and said that he forgot because he was drunk. Kidd testified that he asked Buckley for the payment, and Buckley said to give him five minutes. So Kidd went to the store and then back to his apartment.

¶17. Kidd testified that five to ten minutes later, Buckley brought him the money for the cocaine. According to Kidd, they sat and talked for a minute, and Buckley had "a pint" with him. Kidd testified that around 11 p.m. or 11:30 p.m. they both walked outside to go their separate ways. According to Kidd, before he got in a vehicle to go to the club he noticed two men standing outside. Kidd could not recall the name of the person who drove the vehicle or the name of the club that he went to.

¶18. Kidd testified that after going to the club, he went back to his apartment. When he woke up the next morning, a woman outside told him what happened, and he said, "[T]hey're probably gonna have my name all up in some crap, you know, like they always do." Kidd explained that people in the community disliked him because he had recently served eleven years for strong-armed robbery. Kidd denied going to Boles's house, and he denied robbing

6

and setting Buckley on fire.

¶19.    Ultimately, the jury found Kidd guilty of kidnapping and aggravated assault. The trial court sentenced Kidd, as a violent habitual offender, to serve consecutive terms of life in the custody of the Mississippi Department of Corrections. After the denial of his post-trial motion, Kidd appealed.

## DISCUSSION

### I.    Sufficiency of the Evidence

¶20.    When reviewing a challenge to the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Reynolds v. State*, 227 So. 3d 428, 436 (¶32) (Miss. Ct. App. 2017). "The issue on appeal is not whether the reviewing court would have found the defendant guilty; rather, the conviction must be affirmed if there was sufficient evidence for 'any rational trier of fact' to have rendered a guilty verdict." *Id.*

¶21.    In order to obtain a conviction for kidnapping in this case, the State had to prove that Kidd, acting without lawful authority, and with or without intent to secretly confine, forcibly seized and confined Buckley. Miss. Code Ann. § 97-3-53 (Rev. 2014). At trial, Buckley testified that when they arrived at Boles's house, Kidd stayed in the vehicle with him while the other man knocked on Boles's door. When Boles did not answer, the man returned to the vehicle, and Kidd went and knocked on the door. According to Buckley, someone was in the vehicle with him at all times, and he was not able to leave. He also testified that Kidd had

7

a gun, and the other man acted like he had a gun.

¶22.    In order to obtain a conviction for aggravated assault in this case, the State had to prove that Kidd purposely caused serious bodily harm to Buckley by pouring gasoline or kerosene on him and burning him. Miss. Code Ann. § 97-3-7(2)(a)(ii) (Rev. 2014). Buckley testified that before the men left, they threw gasoline on him, and Kidd used a cigarette lighter to set him on fire. Officer Robinson testified that when he arrived at the hospital, Buckley's room smelled of gasoline, and he noticed that Buckley had been burned.

¶23.    After viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. This issue is without merit.

## II.    Weight of the Evidence

¶24.    When reviewing a challenge to the weight of the evidence, "we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Lloyd v. State*, 228 So. 3d 953, 956 (¶9) (Miss. Ct. App. 2017). The evidence must be viewed "in the light most favorable to the verdict, and we must affirm unless the trial court abused its discretion in denying a new trial." *Id*.

¶25.    Kidd asserts that Buckley was not a reliable witness. But this Court has held that "[w]itness credibility is for the jury to determine." *Duncan v. State*, 240 So. 3d 519, 523 (¶17) (Miss. Ct. App. 2018) (citing *Winding v. State*, 908 So. 2d 163, 168 (¶20) (Miss. Ct. App. 2005)). "The jury acts as fact-finder and must determine the credibility of the

witnesses, and the proper weight to be assigned to their testimony." *Id*. "Any conflicts in the evidence are for the jury to resolve." *Id*. (citing *Williams v. State*, 64 So. 3d 1029, 1033 (¶13) (Miss. Ct. App. 2011)).

¶26. Kidd also asserts that law enforcement disregarded evidence that may have led to other suspects. For example, Kidd argues that law enforcement should have obtained surveillance footage from the club as well as the store near Buckley's house. He also argues that evidence should have been submitted to the crime lab. But the State is not obligated "to present proof of the breadth of its investigation." *Bryant v. State*, 853 So. 2d 814, 820 (¶21) (Miss. Ct. App. 2003). "It is necessary but also sufficient that the State present proof that the defendant committed the crime." *Id*. As discussed in Issue I, the State presented sufficient evidence that Kidd committed the crimes in this case.

¶27. Considering the evidence presented, we do not find the verdict to be so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. Accordingly, the trial court did not err in denying Kidd's motion for a new trial.

### III. Rights to Confrontation and Compulsory Process

¶28. Kidd claims he was denied the right to confront his accuser and the right to compulsory process because David Alexander did not testify at trial.

¶29. The Sixth Amendment to the United States Constitution provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. U.S. Const. amend. VI. "The Confrontation Clause confers a right to confront those

who bear testimony against the defendant." *Chambliss v. State*, 233 So. 3d 898, 903 (¶22) (Miss. Ct. App. 2017) (quoting *Conners v. State*, 92 So. 3d 676, 682-83 (¶16) (Miss. 2012)). Therefore, "the testimonial statements of a witness who does not testify at trial are inadmissible unless the witness is unavailable and the defendant had a prior opportunity for cross-examination." *Id*.

¶30. A review of the record reveals that Kidd failed to raise this issue at trial or in his post-trial motion. Accordingly, Kidd has waived this issue. *See id.* at 903 (¶23); *see also Anthony v. State*, 23 So. 3d 611, 620 (¶41) (Miss. Ct. App. 2009). Notwithstanding the procedural bar to this claim, we note that none of Alexander's alleged testimony was against Kidd. Fonda testified that Alexander told her to go to the hospital. And Lieutenant Bounds testified that Alexander told him that he did not have any information about the incident.

¶31. With respect to his compulsory process argument, Kidd acknowledges that no subpoenas or summons were issued to compel David Alexander's presence at trial. Because Kidd never asserted his compulsory rights or objected at trial, we find that Kidd waived this claim as well. *See Gilmore v. State*, 772 So. 2d 1095, 1100 (¶17) (Miss. Ct. App. 2000); *see also Brandau v. State*, 662 So. 2d 1051, 1054 (Miss. 1995).

## IV. Prosecutorial Misconduct

¶32. Kidd claims the prosecutor engaged in numerous instances of prosecutorial misconduct. "The standard of review for prosecutorial misconduct has been clearly established by the Mississippi Supreme Court as follows: Where prosecutorial misconduct endangers the fairness of a trial and the impartial administration of justice, reversal must

10

follow." *Anderson v. State*, 154 So. 3d 42, 57 (¶48) (Miss. Ct. App. 2014) (quoting *Catchings v. State*, 39 So. 3d 943, 947 (¶10) (Miss. Ct. App. 2009)).

¶33. Kidd's primary complaint is that the prosecutor knowingly used false testimony. But Kidd's defense counsel did not object to this at trial. This Court has repeatedly held that "failure to object contemporaneously at trial waives any claim of error on appeal." *Graves v. State*, 216 So. 3d 1152, 1161 (¶26) (Miss. 2016). Therefore, Kidd waived the right to raise this instance of alleged prosecutorial misconduct on appeal. *Id*. at 1162 (¶26). Notwithstanding the procedural bar, Kidd's argument lacks merit. Kidd's claim is actually a challenge to the weight of the evidence because he disputes the credibility of witnesses and points to conflicts in their testimony. But as discussed, this Court does not determine the credibility of witnesses or resolve conflicts in the evidence. *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). That is the jury's responsibility. *Id*.

¶34. Kidd also claims the prosecutor violated Mississippi Rule of Evidence 404(b). Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." M.R.E. 404(b)(1). But "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." M.R.E. 404(b)(2).

¶35. At trial, Kidd testified that the morning after the incident, a woman told him what happened, and he said, "[T]hey're probably gonna have my name all up in some crap, you know, like they always do." On cross-examination, the prosecutor questioned Kidd about

his testimony:

> BY THE PROSECUTOR: You get up in the morning. They tell you he's been injured, and your first thing come in your mind is, oh, they gonna say I did it?
>
> BY THE DEFENDANT: I mean, you know, you have to know - -
>
> BY THE PROSECUTOR: Why?
>
> BY THE DEFENDANT: - - where I was. You had to know where I was in life before I went and did. I had just done 11-calendar years for a prior conviction, so I had just got home.
>
> . . . .
>
> BY THE DEFENDANT: I violated on probation. I was out from serving a[n] 11-year sentence.
>
> BY THE PROSECUTOR: For what?
>
> BY THE DEFENDANT: I was on probation.
>
> BY THE PROSECUTOR: For what?
>
> BY THE DEFENDANT: On strong-armed robbery, yes.

¶36.    The prosecutor then questioned Kidd about his "propensities" and his "past history to do this type [of] stuff." The prosecutor commented that it "sounds like [the crime in this case] would fit the pattern" because "that follows the M.O." But Kidd's defense counsel did not object to the prosecutor's questioning on the basis that it violated Rule 404(b). Therefore, Kidd waived the right to raise this claim on appeal. *See Graves*, 216 So. 3d at 1161 (¶26); *see also* Tidwell v. State, 806 So. 2d 1146, 1148 (¶8) (Miss. Ct. App. 2002).

¶37.    Kidd also claims that the prosecutor improperly vouched for witnesses. Specifically, Kidd takes issue with the following comment made by the prosecutor: "Nah, you got the

handcuffs put on [you] because the victim identified you. A non-biased witness identified you as holding him in the car, and that all these people - - you're talking about this club, none of that actually exist[s]." Defense counsel objected, asking: "Is this a question, or is [the prosecutor] testifying?" Because defense counsel did not object on the basis that the prosecutor was improperly vouching for a witness, Kidd waived the right to raise this claim on appeal as well. *See Walker v. State*, 671 So. 2d 581, 616 (Miss. 1995).

¶38. Next, Kidd claims that Buckley was given a "second chance" to make an in-court identification of Kidd. At trial, the prosecutor asked Buckley if he saw Kidd in the courtroom, and Buckley said, "No[.]" Buckley was then instructed to stand up and look around the courtroom. Buckley said, "Really, I don't believe the person was from Hattiesburg." The prosecutor clarified that he was asking about Kidd and not the unidentified suspect. Then Buckley identified Kidd as the person who set him on fire. Although Kidd waived this claim as well, it is clear from the record that Buckley was confused and thought he was being asked about the unidentified suspect, not Kidd.

¶39. Finally, Kidd takes issue with the fact that the prosecutor cut off Investigator Bounds's testimony. At trial, Investigator Bounds testified about the investigation. As he started to testify about what the victim told him, the prosecutor said, "I don't want - - just stop. . . . So the jury won't get too lost." It may be inferred from the record that the prosecutor was trying to prevent the witness from eliciting hearsay. Accordingly, this instance of prosecutorial misconduct is without merit.

¶40. We find that Kidd's prosecutorial-misconduct claims were either waived for failure

13

to object at trial or are without merit.

### V.    Ineffective Assistance of Counsel

¶41.    Finally, Kidd claims he received ineffective assistance of counsel.  In order to prove ineffective assistance of counsel, a defendant must show:  "(1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense." *Herrington v. State*, 102 So. 3d 1241, 1244 (¶10) (Miss. Ct. App. 2012) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).  "Essentially, the defendant must show with reasonable probability that but for counsel's deficient performance, the outcome at trial would have been different." *Id*. (citing *Carr v. State*, 873 So. 2d 991, 1003 (¶28) (Miss. 2004)).

¶42.    This Court has held that "[w]hen reviewing a claim of ineffective assistance of counsel, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 1244-45 (¶11) (quoting *Strickland*, 466 U.S. at 689).  "Moreover, 'with respect to the overall performance of the attorney, counsel's choices of whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections fall within the ambit of trial strategy and cannot give rise to an ineffective assistance of counsel claim.'" *Id*. (quoting *Carr*, 873 So. 2d at 1003 (¶27)).

¶43.    The State contends that Kidd's ineffective-assistance-of-counsel claims should not be heard on direct appeal and should be raised in a post-conviction-relief action.  This Court generally does not "consider a claim of ineffective assistance of counsel when the claim is

made on direct appeal because we are limited to the trial court record in our review of the claim, and there is usually insufficient evidence within the record to evaluate the claim." *Id*. at 1245 (¶12) (quoting *Wilcher v. State*, 863 So. 2d 776, 825 (¶171) (Miss. 2003)). But this Court will consider an ineffective-assistance-of-counsel claim when: "(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *Id*.

¶44. Kidd asserts that his attorney failed to investigate, prepare for trial, adequately consult with him, provide discovery materials, raise objections, effectively cross-examine witnesses, and question the victim (Buckley) regarding his medical records. We agree with the State that the record is not adequate to allow this Court to address the majority of Kidd's claims. We note that it is apparent from the record that defense counsel did not cross-examine the victim about his medical records, which suggest that he may have consumed a pint of whisky and indicate that he tested positive for alcohol and opiates on the night that the crimes occurred. But counsel's choice as to whether to ask certain questions falls within the ambit of trial strategy. At this point, we cannot say that the record affirmatively shows ineffectiveness of constitutional dimensions.

¶45. Because there is no obvious deficiency in Kidd's counsel's representation based on the record before this Court and because the State has not stipulated that the record is adequate to address Kidd's claims, we dismiss Kidd's ineffective-assistance-of-counsel claims without prejudice. Should he choose to do so, Kidd may raise all of his ineffective-

15

assistance-of-counsel claims in a post-conviction proceeding.

¶46.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. J. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. TINDELL, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**